William L. MAYO, Plaintiff-Appellant,

v.

Max P. ENGEL, et al.,
Defendants-Appellees.

No. 83–3119.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1984.

John P. Graves, Jr., Sarasota, Fla., for plaintiff-appellant.

Patrick E. Geraghty, Fort Myers, Fla., for Fried, Aaronson & Cohn.

Patrick H. Dickinson, Sarasota, Fla., for Engel & Chlipala.

Before FAY, VANCE and HATCHETT, Circuit Judges.

FAY, Circuit Judge:

Appellant, Dr. William L. Mayo,[1] sued attorneys Max P. Engel and Gerald Chlipala for professional negligence and misrepresentation. This lawsuit stems from legal work done for Dr. Mayo in connection with a business he started. Dr. Mayo conceived of the idea to commercially undertake sales of used furniture, clothing and other small items similar to that done in charitable thrift shops. Attorney Chlipala incorporated "Re-Sell-It Shops, Inc." in Florida and contracted with a trademark search company (Government Liaison Services) for Dr. Mayo, to search the name for purposes of registering and acquiring a trademark. Although Dr. Mayo knew that no determination had been made regarding the use by others of the name Re-Sell-It, he started his business under the assumption that the name would be his exclusively. He then sold all the rights, including the name, to a franchising company (Franchise Concepts, Inc.) for $500,000 and warranted the exclusivity of the name. Unfortunately, the name Re-Sell-It turned out to be "used" by three shops in St. Louis. The used name cost Dr. Mayo $325,000 in expected sale proceeds when the contract of sale with Franchise Concepts was renegotiated. Dr. Mayo brought this lawsuit under diversity jurisdiction in the United States District Court for the Middle District of Florida. At the conclusion of discovery, the district court granted the appellees' motion for summary judgment, finding that there was no genuine issue of material fact and that the appellees were entitled to judgment as a matter of law. Dr. Mayo appealed and we affirm.

We must determine if the district court erred in finding that there are no issues of material fact and that the attorneys are entitled to judgment as a matter of law. The district court's order is not a matter of discretion and is thus independently reviewed in this court. *Morrison v. Washington County*, 700 F.2d 678, 682 (11th Cir.1983). We evaluate whether the moving party has met its burden of showing that there is no genuine issue of material fact. Fed.R.Civ.P. 56. The record is viewed in the light most favorable to the summary judgment opponent. *Arnett v. Kennedy*, 416 U.S. 134, 139–140, 94 S.Ct. 1633, 1637–1638, 40 L.Ed.2d 15 (1974).

## FACTS

The record consists largely of the depositions of the prime actors in this sad tale of the used Re-Sell-It trademark. Dr. Mayo

---

1. Dr. Mayo earned his Ph.D. in education from the University of Michigan. He has been a professor of education for most of his professional career. At the time of his deposition he was employed as the president of a private environmental organization.

stated that he got the Re-Sell-It idea in 1979. While living in Punta Gorda, Florida for the winter Dr. Mayo received the Ft. Myers newspaper. He was impressed by the size and frequency of advertisements in that paper by the law firm of Engel, Aaronson, Fried, Cohn, and Chlipala.[2] Dr. Mayo recalled that the firm advertised that it handled "business and contract law, stocks, divorces and other types of legal problems." (Mayo Dep. at 6–7). He telephoned the firm and a secretary arranged an appointment with Mr. Chlipala.

Dr. Mayo met with Mr. Chlipala in January 1980. He explained his idea for Re-Sell-It Shops to Mr. Chlipala and requested legal advice and service to incorporate and assure the trademark for his shops. Dr. Mayo had recently attended a seminar on franchising in Orlando and was very taken with the possibility for his shops. He told Mr. Chlipala of his vision of a national franchise with a Re-Sell-It Shop in every town. Dr. Mayo testified that Mr. Chlipala indicated that he would immediately incorporate Re-Sell-It in Florida and that he "could handle" the trademark search. (Id. at 8). This interview lasted approximately thirty minutes and concluded with an understanding Mr. Chlipala would initiate these matters and call Dr. Mayo in a few days.

Mr. Chlipala stated that "I told him [Dr. Mayo] we could incorporate him, and check out the name of Re-Sell-It Shops, Incorporated; which we did. As far as the trademark goes, I told him we did not do trademarks, however, I was aware of a company that did do trademarks, or did handle that,

and if he wanted, I would assist him in contacting this company and seeing what they could do." (Chlipala Dep. at 17). Mr. Chlipala did call Government Liaison Services on February 8, 1980 and initiated a national trademark name search for Re-Sell-It. Five days later Dr. Mayo returned to sign the incorporation documents. Dr. Mayo has no complaints with the corporate organization work.

Government Liaison Services responded on March 5, 1980 in a letter that concluded, with the exception of a similar name used in Houston, the name Re-Sell-It was not being used. (Ex. 1–17). The Government Liaison Services report had searched the name in a category for businesses buying and selling securities, which does not include the sale of thrift shop items contemplated in Dr. Mayo's idea.[3] Dr. Mayo received a copy of the report in March and immediately noted the mistake in the category searched. (Mayo Dep. at 30). Dr. Mayo knew that aside from a call to the Florida Secretary of State to search the name for incorporation purposes and the incorrect search done by Government Liaison Services, no other search had been conducted. On March 30, 1980, Dr. Mayo sent Mr. Chlipala an artist's rendition of the logo for Re-Sell-It and asked that it be included in the trademark search and registration work Mr. Chlipala was doing for the name.

Dr. Mayo had returned to his permanent home in Vermont sometime in February. He was going forward with the plan to open a Re-Sell-It Shop and had chosen a site in White River, Vermont. The shop

2. The complaint named all of the partners in Mr. Chlipala's law firm. Since then, by voluntary stipulation all attorneys except Mr. Engel and Mr. Chlipala have been dismissed. Mr. Engel remains in the lawsuit because he is still Mr. Chlipala's law partner and because he had some brief involvement in the case. One day while Dr. Mayo was in Mr. Chlipala's office, he met Mr. Engel who was the then senior partner. Little beyond pleasantries was exchanged but nonetheless Mr. Engel remains a party to this lawsuit.

3. Government Liaison Service got all of its information about what to search from Mr. Chli-

pala in a telephone conversation. Mr. Chlipala testified that he told Government Liaison personnel to search for businesses buying and selling securities. Mr. Chlipala stated that this was what Dr. Mayo had told him was the nature of his business idea at the first meeting. Mr. Mayo denies any such suggestion and states that he simply explained his thrift shop idea for Re-Sell-It to Mr. Chlipala. Mr. Chlipala confessed that he was uncertain about the nature of the business and did not know which category of business it should be searched under when he asked Dr. Mayo to use Vermont counsel on the trademark matter. (Chlipala Dep. at 36).

opened in May, 1980. During the first week of May, 1980, Dr. Mayo contacted a Norwich, Vermont attorney, Mr. Jonathan Brownell. (Brownell Dep. at 5). Dr. Mayo told Mr. Brownell of his plans for Re-Sell-It and asked for his help. Mr. Brownell advised dissolving the Florida corporation and reincorporating in Vermont for tax advantage and because Vermont would be the center of corporate activity. Dr. Mayo told Mr. Brownell that he wished to employ him to reincorporate in Vermont and to arrange for foreign corporation licenses to do business nationwide. He told Mr. Brownell that "he would not need any work done on trademark for his proposed enterprise, which was Re-Sell-It Shops, Inc. as he had done all that work in Florida already ..." (Id. at 7–8). Dr. Mayo further indicated that he would have the Florida attorney send Mr. Brownell any necessary papers.

On April 8, 1980, Mr. Chlipala asked Government Liaison Services to send him a copy of the forms needed to register a trademark. The forms were not immediately forthcoming because a recent Federal Register had published a new form. On April 21st Mr. Chlipala renewed his request for the forms and on May 13th or 14th the pertinent pages of the Federal Register were sent to Mr. Chlipala. Mr. Chlipala testified in deposition that about this time he requested Dr. Mayo take the trademark work to his attorney in Vermont because he was uncertain about the nature of Dr. Mayo's business:

Dr. Mayo had told me that he was going to be buying and reselling securities. Q. What kind of securities? He just indicated to me securities. And, that was you know, the question there, and also the fact of whether or not what he was doing—or what he indicated to me that he was doing was good. At that point in time, you know, I knew that I was getting confused by the whole thing. And, I told him, you had better take this whole thing to your other attorney in Vermont, who Dr. Mayo indicated knew the stuff very well, and make sure you know what you are doing.

(Chlipala Dep. at 36–37).

Mr. Chlipala, at Dr. Mayo's direction arranged for the dissolution of the Florida corporation in mid-May. Thereafter, Mr. Chlipala performed no legal services for Dr. Mayo. Mr. Chlipala stated that "[h]e told me that his attorney was going to handle everything out of Vermont, and was going to take care of getting the trademark, and everything else." (Chlipala Dep. at 38). Mr. Chlipala never proceeded with the trademark registration. Mr. Brownell prepared the registration papers as indicated. By letter dated May 15, 1980, Mr. Chlipala again warned Dr. Mayo "I would suggest that you consult with your counsel in Vermont to be absolutely sure as to what you are doing. As I indicated to you, this matter has gotten rather confusing and Government Liaison Services has not been of much help." (Plaintiff's Ex. 1). Mr. Chlipala also told Dr. Mayo in that letter that he considered all business between them concluded and that he would "close his file."

In early June, Dr. Mayo asked Mr. Brownell to prepare the trademark registration papers for his signature. He made it clear that all he wanted Mr. Brownell to do was to fill out the forms. The papers were prepared and sent to Dr. Mayo. In late June, Mr. Brownell's secretary brought to his attention the fact that the tradename Re-Sell-It had appeared inconsistently capitalized in documents she was filing. Mr. Brownell called Dr. Mayo to inquire about the possible problem and Dr. Mayo told him not to concern himself with the trademark that he was working with the Franchise Concepts staff on the trademark. (Id. at 12).

Franchise Concepts, Incorporated conducted the franchise seminar in Orlando that Dr. Mayo had attended in late 1979 or early 1980. Its president, Donald Boroiam, had spoken with Dr. Mayo then and was very interested in his ideas. Dr. Mayo contacted Mr. Boroiam in late spring 1980 and asked him to come look over his Ver-

mont store and advise Dr. Mayo how to put together a franchise sale operation. Mr. Boroiam flew out to look over the store and was so impressed he began negotiating for the purchase of the franchise rights and trademark by Franchise Concepts, Inc.

Mr. Brownell meanwhile proceeded with registering Re-Sell-It as a foreign corporation in about twenty states until Dr. Mayo told him to stop. In October, 1980, Dr. Mayo appeared in Mr. Brownell's office. He informed Mr. Brownell that he had just concluded the negotiations for the sale of Re-Sell-It to Franchise Concepts. He wanted Mr. Brownell to prepare legal documents embodying the sale terms that afternoon so that he could fly to Chicago that evening and sign the contract. Mr. Brownell stated that he prepared the contract largely from Dr. Mayo's dictation and that at no time did he negotiate for or counsel Dr. Mayo about the deal. The contract included a clause that allowed Franchise Concepts to rescind if it were discovered that Re-Sell-It was not an exclusive trademark. At the time of the sale the trademark registration was still pending. The sale price was $500,000 which represented a considerable profit to Dr. Mayo who had invested a total of $30,000 in the entire project. Dr. Mayo received the first payment of $30,000 and no others because Franchise Concepts is insolvent.

After the sale of Re-Sell-It, Franchise Concepts investigated the trademark and found that the registration papers had never been properly filed and that three stores engaged in a similar trade in St. Louis were operating under the Re-Sell-It name. (Telegram of 12/12/80 from Franchise Concepts, Inc. to Jonathan Brownell). The contract of sale was executed October 15, 1980 and the lack of exclusivity was discovered by December 15, 1980. Mr. Boroiam first responded by indicating that he wished to exercise his contractual privilege of rescission. Dr. Mayo then hired a third attorney, Mr. Benjamin Reese, II, a specialist in intellectual property. Mr. Reese renegotiated the contract with Franchise Concepts for a reduced price of $175,000. This amount reflected the adjustment due to the faulty trademark. There is no indication in the record that the renegotiated contract price was other than reasonable.

The record includes Mr. Reese's deposition about how an expert in trademarks would have handled Dr. Mayo's trademark. Another expert, David W. Pettis, Jr., also testified how a trademark search and application should be handled. We note that Mr. Chlipala's actions fall short of those that an expert in the area would have undertaken.

## IS THERE AN ISSUE OF MATERIAL FACT?

■ Dr. Mayo's complaint alleges negligence and misrepresentation. The parties agree that a cause of action in negligence requires showing the attorney's employment, the attorney's neglect of a reasonable duty, and that the negligence was the proximate cause of the loss to the client. *Weiner v. Moreno*, 271 So.2d 217 (Fla. 3rd D.C.A. 1973). *See Maryland Casualty Co. v. Price*, 231 F. 397 (4th Cir.1916). Appellees argue that the negligence, if any, of Mr. Chlipala was not the proximate cause of Dr. Mayo's injury. We do not reach the proximate cause issue urged by appellees.

■ The scope of Mr. Chlipala's employment or whether he undertook to act as more than a go-between in the trademark search is an unresolved issue of fact. In support of his contention that he was only a go-between, Mr. Chlipala shows that he received no fee for this service and that Dr. Mayo paid Government Liaison Services by corporate check. The scope of Mr. Chlipala's undertaking, however, is not material for the reasons discussed below. Assuming for purposes of this discussion that Mr. Chlipala did undertake to begin the trademark search, the undisputed facts in the record show that Dr. Mayo was informed of the limited search and more importantly, Dr. Mayo knew that the Government Liaison Services search had been conducted under the wrong category of business. (Mayo Dep. at 30). Dr. Mayo's own testimony shows that he knew the Government Liaison Services work was in error and that

no steps had been taken to correct it when Mr. Chlipala was fired.

Mr. Chlipala's testimony that he told Dr. Mayo that he was getting confused and that Dr. Mayo had better get the more expert Vermont counsel to handle the trademark matter is undisputed. Dr. Mayo's testimony does not contradict Mr. Chlipala's statement that Dr. Mayo told him Vermont counsel was handling everything in May. Dr. Mayo then fired Mr. Chlipala, knowing full well at the time that the trademark search had not been fully or correctly completed. It was unreasonable for Dr. Mayo to consider the search completed when he knew otherwise.

Dr. Mayo never specifically stated that he relied on the search work initiated by Mr. Chlipala, and indeed he could not so testify because he knew the search was bad and at best incomplete. John Graves, Jr., counsel for the appellant, filed an affidavit in which he swore that Dr. Mayo told him he relied on Mr. Chlipala's work as a good search. (R. Vol. I at 184). Dr. Mayo did not so testify himself and his lawyer's affidavit is not cognizable evidence. Fed. R.Civ.P. 56(e). Dr. Mayo knew at the time that he ended Mr. Chlipala's work on the trademark search that the search was bad. Rather than have Mr. Chlipala ask Government Liaison Services to search anew under the proper business heading, Mr. Chlipala was fired.[4]

By the time Mr. Chlipala was fired, he had told Dr. Mayo that (1) he could not handle the trademark search because he was getting confused; (2) that the search done then was in error; and (3) that Dr. Mayo should get a more expert lawyer to handle the matter. Knowing these three things, Dr. Mayo proceeded with the registration without getting Mr. Brownell to conduct a search.[5] Dr. Mayo now attempts to hold Mr. Chlipala liable for the faulty work he knew about in May; 1980, well before he began negotiating the sale with Franchise Concepts. Whether phrased in terms of unreasonable reliance, proximate cause or knowledge, the law does not allow Dr. Mayo to fire an attorney mid-way in a task (the search) that Dr. Mayo knew was at best incomplete and then hold him liable for the consequences of Dr. Mayo acting as if the search were successfully completed. Mr. Chlipala's negligence, if any, is therefore not a basis for relief.

The record does not disclose any facts that support a cause of action in misrepresentation. There is no evidence that the appellees' law firm held themselves out to the public to be expert in trademark work. The facts viewed in the light most favorable to the appellants show that Mr. Chlipala said only that he could "handle" Dr. Mayo's requests for work at the initial interview. Whether he could not in fact handle the tasks is an issue of professional negligence, not misrepresentation.

We find there is no issue of material fact and that appellees are entitled to judgment as a matter of law. We AFFIRM the district court's order granting summary judgment.

---

**4.** There is expert testimony that tends to show that an intellectual property expert would have taken more action than Mr. Chlipala did; however, there is no evidence that Government Liaison Services is not qualified to carry out the trademark search if the appropriate information is given them. Nor is there evidence that it was negligent to contact them in the first place.

**5.** When Mr. Brownell was fired he covered his flanks by writing a letter to Dr. Mayo outlining exactly what he had undertaken on Dr. Mayo's behalf and the substance of all communication.

It appears that the trademark papers filled out by Mr. Brownell were discovered to be faulty by Franchise Concepts. Mr. Brownell had by letter warned Dr. Mayo of the possibility of error in the capitalization of the logo before Dr. Mayo signed and sent in the trademark papers. It appears Dr. Mayo had a pattern of ignoring counsel and proceeding anyway. As Mr. Brownell wrote in his recognition of termination letter, "[i]n short, Bill, you do not make it easy to represent your interests." (Letter of 12/16/80, Brownell to Mayo)